## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEBRA J. MAIMONE,<br><br>                    Defendant. | Crim. Action No. 21-CR-289(RDM) |

### MEMORANDUM IN AID OF SENTENCING

Debra Maimone ("Debra or "Ms. Maimone") will be before the Court for sentencing having accepted responsibility for taking items from the Capitol building on January 6, 2021 in violation of 18 U.S.C. §§ 641, 2. Ms. Maimone's conduct that day was an isolated aberration and it does not reflect her life and character before and after January 6. Egged on and encouraged by the crowd who, in turn, had been egged on and encouraged by Mr. Trump and other speakers at the rally, Ms. Maimone momentarily lost the moral compass that steers her towards honest work and ethical conduct. She has spent the years since January 6, regretting her conduct — not just because the notoriety has negatively impacted her own life and small business, which it has, — but because of her role in what she now realizes was a horrible event in our country's history. *See* Letter of Sharon Maimone ("[Debra] said that she regrets being part of such a notorious day for our country . . .").

Ms. Maimone has reviewed the Pre-Sentence Report (PSR) and offers no objection to the PSR's assessment of offense level 6, criminal history category I, resulting in a guideline range of 0 to 6 months. It is worth noting here that were Ms.

Maimone sentenced in November, she would likely receive an additional two-level "zero-point offender" adjustment, currently proposed by the Sentencing Commission and anticipated to take effect on November 1, 2023. After this adjustment, her total offense level would be 4, also yielding a guideline range of 0-6 months.[1]

Counsel respectfully submits that application of the factors set forth in 18 U.S.C. § 3553(a) militates in favor of a sentence that recognizes that imprisonment is, at best, an imperfect sanction, especially for Ms. Maimone, whose offense conduct represents a single deviation in a life of hard work and generosity towards others. Instead, a sentence of two years of probation with conditions, including community service, will fairly reflect Ms. Maimone's lack of criminal history, her unlikelihood of recidivism, her perfect compliance with supervision, and the non-violent nature of her aberrant offense conduct.

### Procedural History

Ms. Maimone was arrested on March 19, 2021, and charged by complaint with three misdemeanor offenses arising out of her presence at the U.S. Capitol on January 6. The Federal Public Defender was appointed to represent Ms. Maimone. Ms. Maimone, through counsel, expressed a willingness to accept responsibility and

---

[1] The United States Sentencing Commission has submitted amendments to the Guidelines to Congress. Unless Congress acts to reject the amendments—which is unlikely and has occurred only once since the Guidelines were first promulgated— the amendments will take effect on November 1, 2023. *See* 28 U.S.C. 994(p). One of the proposed amendments would add a guideline, § 4C1.1, providing for an adjustment for certain "Zero-Point Offenders." This adjustment will decrease the offense level by two levels for defendants, like Ms. Maimone, who have no criminal history points and have been convicted of a non-violent offense.

cooperate with the government from the outset. The first assigned Assistant United States Attorney, who was stationed in Puerto Rico, explored with his supervisors whether the government would be interested in Ms. Maimone's cooperation, which she remained more than willing to do. Ultimately, the government declined to offer Ms. Maimone a cooperation agreement. Next, there were delays caused by Hurricane Fiona, which impacted the government's ability to work on the case as the then-assigned prosecutor remained stationed in Puerto Rico. Throughout, Ms. Maimone continuously consented to tolling time under the Speedy Trial Act and waited for a plea offer, while counsel conveyed Ms. Maimone's willingness to accept responsibility. For example, on January 17, 2023, undersigned counsel sent the then-assigned assistant an email stating: "just want to flag that we have a status report due Friday and reiterate that my client remains interested in resolving the case." On April 3, 2023, the current assigned prosecutor extended a plea offer for the first time. Ms. Maimone immediately agreed to accept the plea and entered her plea to one count of misdemeanor theft on June 2, 2023.  Pursuant to the plea agreement, Ms. Maimone agreed to pay a total of $1806.00[2]. A sentencing date of August 25, 2023, was scheduled after which Ms. Maimone cooperated fully with the pre-sentence investigation and the terms of her plea agreement.

## I. The sentencing factors support a probationary sentence.

### A. Debra's history and characteristics show that probation is appropriate.

---

[2] All but $500 is owed jointly and severally with Mr. Vogel.

Debra Maimone's life, character, and conduct before and since January 6, 2021 show that a period of incarceration is unwarranted.

### i.    Debra grew up in rural Pennsylvania in a loving, working-class family.

Debra was born thirty years ago in Pennsylvania to unmarried parents who frequently moved the family around the state. Her father, a construction and landscape worker, and mother, owner of a cleaning business, worked hard to provide for their family. Despite their efforts, the family was working class and experienced periodic economic instability. Consequently, Debra's stepbrother was raised by his grandparents in a different area of Pennsylvania. Debra has positive relationships with her parents and stepsibling.

Debra was mostly raised in Burgettstown, Pennsylvania but her upbringing took her through western Pennsylvania. Her family moved to Belmont, Ohio when she was five years old and continued moving for the bulk of her childhood. Her parents would buy a home, fix it up and then move to a different place in each city they lived in. Despite the frequent moving and periodic economic instability, Debra had a good childhood and participated in activities such as gymnastics, tap dancing, and Girl Scouts. When she was 11 years old, she was in a bad car accident and suffered from a head injury.

Debra was diagnosed with depression and anxiety a few years later, when she was 14 or 15 years old. She received outpatient mental health treatment in Burgettstown for a few months. Debra was prescribed Prozac and Ativan to treat her depression and anxiety during this course of treatment but refused since she does not

4

like taking medication. She has not had therapy or counseling since she was a teenager. Debra believes she would benefit from therapy, especially since her anxiety has worsened due to her involvement in this case.

### ii. Debra had learning issues that were not addressed by the school system and left school at age 16 to find employment.

Throughout grade school and into high school, Debra faced learning difficulties, which ultimately motivated her decision to leave school altogether. Given her learning differences, Mrs. Maimone homeschooled Debra for one year, but Debra was mostly educated by the Pennsylvania public school system.

Debra attended Burgettstown High School until her difficulties in school forced her to drop out. She had trouble paying attention in her classes and was held back in tenth grade. The school did not offer her specialized services and her parents could not afford to engage tutors and therapists. Not wanting to be held back again, Debra dropped out of high school at age 16 and started working. No one in the school system attempted to stop her from leaving school.

Debra does not have any professional licenses and has not received vocational training but she has expressed interest in obtaining her GED.

### iii. Debra started working at 16 years old and moved out of her parent's home at 18 years old to pursue a relationship.

Debra found her first job as a server in a restaurant where she worked for about one year. When she was 18 years old, Debra moved out of her parents' home to live with her then-boyfriend. The relationship ended after six years because the boyfriend was controlling and emotionally abusive. Debra moved back in with her

5

parents for a few months after the end of that relationship. She soon moved into her own apartment in McKee's Rock, Pennsylvania. After saving for a few years, Debra bought a home in New Castle, PA, which she sold a few years later due to the home's faulty foundation.

Debra has been with her current partner, Phillip Vogel, for roughly six years, and the pair became engaged in 2019. Mr. Vogel is in recovery and was working in construction when the two met. He has a nine-year-old daughter from a previous relationship, Vera. Debra has embraced her role as stepmom to Vera and the two enjoy a close relationship. Mrs. Maimone writes that Debra is a good stepmother and that she takes care of Vera and "… [does] everything for her and with her …"[3] Vera's mother, Dana Kosek, speaks highly of Debra's role in her daughter's life, and writes that "[Debra] makes sure that my daughter is cared for the way that I would care for her when Vera is at their house."[4] Ms. Kosek writes that Debra teaches Vera, helps her with her homework, prays with her, and has conversations with Vera when she's "struggling with emotional growing pains."[5] Ms. Kosek sums up what Debra has done for Vera in her letter to the Court:

> Debra has become another support system not just in my daughter's life, but in my life as well … Anytime that I need her for anything concerning Vera, she is there. Debra's character and morals have been proven to my daughter and myself time and time again."[6]

---

[3] Letter of Sharon Maimone.
[4] Letter of Dana Kosek.
[5] *Id*.
[6] *Id*.

Picture of Debra and Vera below:



In 2022, Debra bought a house for where she, Phillip, and Vera live together. Debra enjoys a stable family life with Phillip and Vera.

### iv.   Debra found job satisfaction in the cleaning business and started her own business.

Debra left restaurant work to become a part-time cleaner at Afab Services when she was 19, where her work mostly consisted of cleaning office buildings. Not satisfied with just one source of income, she started a second part-time cleaning job in 2016 for Auvil Enterprises, based out of Lisbon, Ohio. Debra developed a love for cleaning, finding that she was good at it and she took pride in a hard day's work.

No matter where she worked, Debra's strong work ethic shone through. Her former employer at Auvil Enterprises writes, "[Debra] she was always on time and never missed a day. She did outstanding work and moved around to multiple facilities

when asked without complaint."[7] Debra also worked for her mother in 2018 to 2019, and traveled 90 minutes both ways to work to fill in when Mrs. Maimone needed help.[8] She has recently started working with her mother again.

In 2018, Debra left her two part-time jobs at Afab and Auvil Enterprises to pursue her dream of starting her own small cleaning business: V-1A Construction and Cleaning. The company provided cleaning and remodeling services. Debra even brought Mr. Vogel on to help train the company's employees. The business was successful from 2019 to 2020, with profits soaring to three times what Debra made in her prior career. Picture of Debra at work:



Unfortunately, the COVID-19 pandemic restrictions, which cautioned against having visitors inside the home and working in an office,[9] nearly shuttered Debra's

---

[7] Letter of Lee Auvil.
[8] Letter of Sharon Maimone.
[9] *See e.g.*, White House, *Coronavirus Guidelines for America*, Mar. 16, 2020, at 2, https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

dream.[10] Suddenly, Debra no longer had a stream of clients and her business suffered. Debra felt helpless as she watched her dream small business die due to forces totally out of her control.

The final blow to Debra's cleaning business came in the form of negative online reviews following January 6. Internet users identified small business owners who had attended the Stop the Steal rally and flooded their business' Yelp and Google sites with negative reviews.[11] Debra's business was no exception. Users flooded her business's Yelp site with negative reviews, which have been removed for violating the site's Terms of Service. Screenshots of the removed Yelp reviews for Debra's business below.



---

[10] *See* Harmeet Kaur, *The coronavirus pandemic has been catastrophic for house cleaners and nannies*, CNN, Apr. 30, 2020, https://www.cnn.com/2020/04/03/us/social-distancing-pandemic-domestic-workers-trnd/index.html.

[11] *See* Cady Lang, *These Business Owners Made Their Feelings for Trump Clear, and So Did Their Customers*, TIME, Jan. 26, 2021, https://time.com/5931320/businesses-boycotted-capitol-riots/.

Debra's business was unable to recover following the COVID-19 pandemic and the online attacks, so she turned to online work, creating content and items, to make ends meet.

### v.    Debra serves her community and family.

Debra's loved ones describe her as a generous, hardworking, and deeply caring individual. They write about her deep commitment for her community and family.[12] Mrs. Maimone writes that though she is struggling financially herself, Debra regularly donates her belongings to women's shelters and other charities.[13] Her loved ones write about how she goes above and beyond to help her family. For example, Debra bought her mother a phone and pays the monthly phone bill.[14] She also takes care of her 84-year-old grandfather's day-to-day needs.[15] When her uncle was dying of brain cancer, took care of him and his pets, driving over an hour each way to buy groceries and supplies for his animals and refusing any payment in return.[16] To this day, Debra keeps her recently-deceased uncle's legacy alive by assisting with efforts to sustain his camp for troubled kids by helping with construction and donating money to it.[17] Debra, her uncle, and another family member pictured below.

---

[12] Letters of Sharon Maimone, Robert Maimone, Robert Knollinger, & Dana Kosek.
[13] Letter of Sharon Maimone.
[14] *Id.*
[15] Letter from Robert Maimone.
[16] *Id.*
[17] *Id.*



### vi.    Debra's conduct since January 6 shows that she is remorseful.

Debra's multiple letters of support offer personal perspectives on her kindness, strong work ethic, and dedication to her family. Many of the letters describe her deep regret for her participation in the events of January 6. Indeed, in the days that followed January 6, Debra watched news stories of what happened and realized that people had been seriously hurt and even died that day. She is ashamed that she was part of it. Debra has cried on her father's shoulder and told him how sorry she is for going to the Capitol that day.[18] Her mother writes that Debra deeply regrets her involvement in January 6 and wishes she never went at all.[19] Mrs. Maimone writes that Debra is not violent and is not "the type to ever take anything from anyone … I do believe that she got swept up in the crowd mentality because taking stuff is not in

---

[18] *Id.*
[19] Letter from Sharon Maimone.

her nature."[20] Debra's brother observed that Debra is "embarrassed and remorseful about going to Washington, D.C."[21]

Debra's expressions of remorse to her loved ones shows that she understands that the events of January 6 were wrong. She understands how her actions – though they were not violent – contributed to the chaos of the day. Since January 6, she has been compliant with all conditions of release and from the outset, she expressed her willingness to accept responsibility. A sentence of imprisonment is not needed to deter Debra from engaging in similar conduct ever again.

**B. The nature and circumstances of the offense militate in favor of a probationary sentence.**

Debra was just 27 years old when she attended the Trump rally with her fiancée and co-defendant, Philip Vogel. Debra was raised in a conservative home but did not actively follow politics until President Trump exploded onto the scene in 2015. Debra liked Mr. Trump's straightforward way of speaking and felt that he cared about hardworking people like herself and her family. She cast her first vote ever for Mr. Trump in 2016. Prior to January 6, she attended three rallies hosted by Mr. Trump. The crowds at the rallies were energized but not at all violent. When she heard about the "Save America" rally planned for January 6, 2021, Debra assumed it would be another energetic, fun rally and a final chance to hear Mr. Trump speak. She and Mr. Vogel drove to D.C. together to attend the rally. They did not bring weapons of any

---

[20] *Id.*
[21] Letter of Robert Knollinger

kind or any protective gear because all they were planning to do was attend a rally organized by the President.

Debra and Mr. Vogel arrived at the Ellipse in time to hear most of the speeches, though from where they were standing, they could not hear everything the speakers said. They did hear Mr. Trump tell his supporters to go to the Capitol and people in the crowd were saying that Mr. Trump was going to speak again at the Capitol. Excited by the prospect of hearing Mr. Trump again, Debra joined the crowds, physically and emotionally, and made her way to the Capitol with Mr. Vogel. To her enduring regret, they followed the crowd up to the building and through the Senate Wing door, which had already been breached by other rally-goers.

Prior to January 6, Debra had never before been inside the Capitol. She was at once awestruck by the beautiful building and moved by the energy of the crowd. Not knowing where she was going, she followed the stream of the crowd through the Rotunda and into the Senate chamber. Inside and outside, she had been exposed to tear gas. When she saw another protestor taking a gas mask out of a bag she impulsively grabbed one, thinking she would use it to protect against the tear gas. Inside the Senate gallery, she removed a bag, which she later discovered had hoods. She had no real plan for what to do with the items; her acts were impetuous and out of character. When she got home, she threw everything away.

Debra never once threatened or engaged in physical violence with anyone. In the days that followed, she did not boast about taking the items. To the contrary, as

she realized the gravity of what happened, she expressed her fear and regret to her loved ones and prepared to accept responsibility for her actions.

### C. The requested sentence will avoid unwarranted disparities.

### i. Probation-only sentences are imposed in the majority of federal misdemeanor theft cases

Probationary sentences are the norm in federal misdemeanor theft cases. The PSR offers Judiciary Sentencing Information (JSIN) data associated with the applicable guideline. A further in-depth review of the JSIN during the last five fiscal years (FY2017-2021), provided by the Sentencing Resource Counsel (SRC), revealed 151 cases similar to Ms. Maimone's in that the primary statute of conviction was 18 U.S.C. §§ 641 and 2, the total offense level was 4 and a the defendant was in criminal history category I.[22]

Probation-only was imposed in 125 (**82.78%**) of the federal misdemeanor theft cases with the same offense level and criminal history category as Ms. Maimone. In 12 of the 151 cases (7.94%), a short prison sentence was imposed and in another 12 cases (7.94%) only a fine was imposed. Probation plus home confinement or detention was imposed in two cases (1.32%). With respect to the 12 cases in which a prison sentence was imposed, in eight of those cases, the sentence was effectively "time-served." Only four among the 151 defendants received a sentence beyond time-served,

---

[22] The data used for these analyses was extracted from the U.S. Sentencing Commission's "Individual Offender Datafiles" spanning fiscal years ExcelFY17to21. The Commission's "Individual Offender Datafiles" are publicly available for download on its website. U.S. Sent'g Comm'n, Commission Datafiles, https://www.ussc.gov/research/datafiles/commission-datafiles.Additional information about the cases comes from the Sentencing Resource Counsel.

though no theft defendant received a sentence of imprisonment of 90 days or more, which the government has requested for Ms. Maimone.[23]

### ii. The two other January 6 cases in which theft was the sole offense of conviction show that probation is appropriate for Ms. Maimone.

With respect to other January 6 cases, based on counsel's review of the government's sentencing chart, there are only two other January 6 cases, like Ms. Maimone's, in which a the sole offense of conviction was 18 U.S.C. § 641. In one of the cases, *U.S. v. Petrosh*, the district judge imposed a sentence of **ten days** followed by one year of supervised release where the defendant, a former Marine, stole two microphones from the Speaker's lectern, rendering him, according to the government, "among the more culpable of the misdemeanor defendants arising out of January 6."[24] In addition to stealing the microphones, Mr. Petrosh positioned himself at the front of a standoff between rioters and U.S. police inside the crypt and told one of the officers, "Give us Nancy."[25] In the hours after, Mr. Petrosh bragged to his friends that he had "f**ed" up their house and that he "got your souvenir … Microphone from congress hall."[26] Mr. Petrosh also smoked a cigarette in the Rotunda.[27] He later minimized his participation in interviews with the FBI, stating that members of congress were lucky "that's all that happened."[28] By the time of sentencing, Mr.

---

[23] Among the four cases in which a sentence beyond time-served was served, 82 days was the lengthiest sentence imposed. In that case, the restitution owed was $6,472.
[24] *United States v. Petrosh*, 1:21CR347, Gov. Sent. Memo, ECF. No. 40 at 1. (10 days imposed where government requested 120 days).
[25] *Id*. at 2.
[26] *Id*. at 10.
[27] *Id*. at 2.
[28] *Id*.

Petrosh still expressed his belief that the protestors were justified in entering the Capitol.[29] In contrast to Mr. Petrosh, Ms. Maimone did not minimize or glorify her conduct after January 6 and instead expressed her remorse to her loved ones, including her mother, father, brother, and her step-daughter's mother, to name a few. Unlike Mr. Petrosh, she did not utter any threats or insults while in the Capitol.

In the second January 6 case in which the sole offense of conviction was a violation of 18 U.S.C. § 641, the defendant, William Merry, stormed past multiple police lines after witnessing rioters forcibly remove barricades and led his 21-year old niece into the mob with him.[30] Mr. Merry penetrated security throughout the building all the way into the Speaker's inner office and exited through a broken window.[31] While in the Speaker's office, he encouraged his niece to pick up a shard of Speaker Pelosi's office sign that had just been smashed and roamed the Capitol chanting, "Nancy, Nancy," and calling the Speaker a "c**t."[32] Mr. Merry later proudly displayed the shard of the sign on Capitol grounds and called himself a hero in an interview

---

[29] *Id.*

[30] *United States v. Merry*, 1:21CR748, Gov. Sent. Memo, ECF No. 41 at 2. The two cases the government cites are unpersuasive in that misdemeanor theft was not the sole offense of conviction in those cases. *See* Gov. Memo, ECF. No. 74 at 24-25. Moreover, defendant Riddle resold the items he took from the Capitol, in contrast to Ms. Maimone. *Id.* at 24. Defendant Ashcroft used a knife to destroy government property and enabled other rioters to see through scaffolding. He also stole a flag and pole, burned the items and attempted to dispose of the items in a pond. *Id.*

[31] *Id.*

[32] *Id.*

after January 6.[33] Mr. Merry was convicted of misdemeanor theft and sentenced to **45 days**, notwithstanding the government's request of 120 days.[34]

In contrast to Mr. Merry, Ms. Maimone did not roam around the Capitol chanting threatening and abusive language about anyone, let alone a member of congress. She did not glorify her conduct or fancy herself some sort of hero. It bears repeating here that she has wholeheartedly accepted responsibility for her actions.

Taking into consideration all of the surrounding circumstances, the two other January 6 cases in which misdemeanor theft was the sole offense of conviction show that a sentence of probation would avoid unwarranted disparity. This is because, unlike Mr. Petrosh and Mr. Merry, Ms. Maimone's conduct on January 6 did not involve threats of violence and because she did not continue to glorify or justify her conduct after January 6.

## II. A sentence of two years of probation, in addition to the significant collateral consequences that Ms. Maimone has and will experience, will promote the goals of sentencing.

A sentence of two years of probation would address the § 3553(a) factors and provide a just result in this case. It is a meaningful sentence, during which Ms. Maimone's liberty will be significantly curtailed. It is also a fair sentence — one that would enable Ms. Maimone to continue working to save towards restitution.

### i. Just Punishment

---

[33] *Id*. at 3.
[34] *See id*. and 1:21CR748, Government Judgment in a Criminal Case, No. 49 at 2.

17

Ms. Maimone recognizes that though it was never her intention on January 6, her conduct put first responders at risk by removing protective gear from the Capitol building. She accepts that punishment of this conduct is appropriate, in addition to the restitution she will pay. She has already been punished in that her fledgling cleaning business went under when news of her arrest was publicized in the community. As described above, people who opposed what happened on January 6 left false reviews about her cleaning service online, causing her to lose the few customers she had left after the COVID-19 pandemic. The sentencing court can and should take these collateral punishments into account in fashioning a sentence. *See, e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure from sentencing guidelines where defendant was already punished by the loss of his business as a result of his EPA-related charges); *see also United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) (holding that a court may properly consider the host of collateral consequences that attend a felony conviction, including loss of benefits and difficulty finding future employment, when fashioning a sentence).

Furthermore, while embarrassment is not typically a consideration for retribution within the sentencing framework, it has been recognized as a legitimate consideration is certain circumstances. *See, e.g.*, *United States v. Gementera*, 379 F.3d 596, 602 (9th Cir. 2004) ("While humiliation may well be—indeed likely will be—a feature of defendant's experience […], the humiliation or shame he experiences should serve the salutary purpose of bringing defendant in close touch with the real

significance of the crime he has acknowledged committing."). As someone who had never before been in trouble, Ms. Maimone was humiliated by the notoriety of her arrest and false posts about the business she had worked so hard to build.

### ii.     Incapacitation, Deterrence, and Respect for the Law.

A sentence of two years probation, when paired with the significant collateral consequences Ms. Maimone has sustained, is more than sufficient to have a deterrent effect. There is no question that Ms. Maimone poses little risk of recidivism. In addition to Ms. Maimone's law-abiding conduct prior to and after January 6, the Sentencing Commission has also objectively quantified her low likelihood of recidivism. Specifically, the Commission has found that first offenders like Ms. Maimone are rarely reconvicted of a crime. In fact, only three-point-five percent (3.5%) of first offenders with zero (0) criminal history points are ever reconvicted. [35]

Moreover, Ms. Maimone will not simply go free; she will have an additional lengthy period of supervision and community confinement if this Court orders it as a condition. That sends a message to the public that theft conduct will be punished. And, indeed, the most effective deterrent is the *certainty* of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (" … given that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating

[35] *See U.S. Sentencing Comm'n, Recidivism and the First Offender* (May 2004); available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

social conditions encouraging crime and on non-incarceratory techniques."); *see also The Growth of Incarceration in the United States*, Nat'l Resource Council, at 131 (2014) ("[O]ne of our most important conclusions is that the incremental deterrent effect of increases in lengthy prison sentences is modest at best.")

Finally, a sentence that accounts for the individual as a whole and recognizes prison is not always an appropriate sanction, especially for non-violent first offenses, will show respect for the law. A sentence of probation complies with 28 U.S.C. § 994(j), which directs that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense.

## Conclusion

For the reasons herein and any others that appear to the Court, Debra Maimone respectfully submits that a sentence of probation with conditions and restitution is sufficient but no greater than necessary to meet the goals of sentencing.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite
550
Washington, D.C.  20004
(202) 208-7500

20